Samuel **SPENCER**, as Personal Representative of the Estate of Loy W. Henderson, Appellant,

v.

Julia B. **WILLIAMS**, as Conservator of the Person and Estate of Elise M. Henderson, Appellee.

No. 87–982.

District of Columbia Court of Appeals.

Argued Oct. 12, 1988.
Decided Feb. 12, 1990.

Donald K. Graham, with whom Richard A. Holderman, Washington, D.C. was on the brief, for appellant.

Michael F. Curtin, with whom Karen S. Berky, Washington, D.C., was on the brief, for appellee.

Before BELSON and TERRY, Associate Judges, and MACK, Senior Judge.[*]

MACK, Senior Judge:

This case raises issues as to the circumstances under which an incompetent surviving spouse may renounce the will of the predeceasing spouse. Appellant, the personal representative of the decedent's estate, appeals from an order of the trial court ratifying the decision of the conservator for the decedent's incompetent wife to renounce the decedent's will on the wife's behalf and elect instead for her to receive the statutory share of his estate. Appellant asserts three errors on appeal: (1) that the conservator's election was not timely; (2) that the trial court applied an incorrect standard in determining whether to ratify the renunciation of the will; and (3) that even under the standard applied, the renunciation should not have been approved. We affirm.

I.

Loy W. Henderson and Elise M. Henderson were married on December 3, 1930, and remained married for almost fifty-six years, until Mr. Henderson's death on March 24, 1986. Mr. Henderson had a distinguished career as a Foreign Service officer; during their marriage, Mrs. Henderson did not have salaried employment outside the home. The Hendersons had no children.

At the time of Mr. Henderson's death, he was ninety-three years old and his wife was eighty. Since August 1980, Mrs. Henderson had been living in a nursing home. She was apparently infirm, although no formal finding of incompetency was made. On March 14, 1985, Mr. Henderson executed his last will and testament.

On April 15, 1986, Mr. Henderson's will was admitted to probate, and Samuel Spencer was appointed personal representative of the estate. On May 21, 1986, Mr.

Spencer filed a petition seeking the appointment of a conservator for Mrs. Henderson. After an investigation by a guardian ad litem and a hearing, the court concluded that Mrs. Henderson was "incapable of caring for her person and estate" and, on July 11, 1986, appointed Julia B. Williams as conservator for Mrs. Henderson, a position for which Ms. Williams qualified six days later.

On October 14, 1986, Ms. Williams filed, on behalf of Mrs. Henderson, a Renunciation of Devises and Bequests with the Office of the Register of Wills. Ten days later, Mr. Spencer, the personal representative of Mr. Henderson's estate, sent a letter objecting to this renunciation. Subsequently, on November 14, 1986, the conservator filed a motion asking the court to ratify the renunciation *nunc pro tunc.* Mr. Spencer filed a response, and a hearing was held on the matter. Mrs. Henderson subsequently died on April 24, 1987. On June 3, 1987, the trial court issued an order ratifying the renunciation of the will.[1] Mr. Spencer now appeals this decision.

II.

The first issue presented to this court is whether Ms. Williams, in her capacity as conservator of Mrs. Henderson's person and estate, filed a timely renunciation of the will. D.C.Code § 19–113 (1989 Repl.) provides, in pertinent part, as follows:

(a) ... [A] surviving spouse is, by a devise or bequest ... barred on any statutory rights or interest he has in the real and personal estate of the deceased spouse or dower rights, as the case may be, unless, within six months after the will of the deceased spouse is admitted to probate, he files in the Probate Court a written renunciation....

\* \* \* \* \* \*

(c) ... A renunciation or election may be made in behalf of a spouse unable to act for himself by reason of infancy, incompetency, or inability to manage his

---

\* Judge Mack was an Associate Judge of the court at the time of argument. She was commissioned as a Senior Judge on December 1, 1989.

1. The trial court's opinion in this case appears at 115 Daily Wash.L.Rptr. 1409 (July 9, 1987).

property, by the guardian or other fiduciary acting for the spouse when so authorized by the court having jurisdiction of the person of the spouse.

Thus, a competent spouse who wishes to renounce the will of the predeceased spouse and instead take the amount provided for by statute must file a statement to this effect within six months after the will is admitted to probate. Appellant asserts, however, that where the surviving spouse is incompetent, the statute requires that the conservator have received prior court authorization before any renunciation is effective to toll the statute. In other words, appellant argues, where there is an incompetent spouse, both the election and court approval of it must occur within the six-month period.

▮ In the present case, the will was admitted to probate on April 15, 1986. On October 14, 1986, one day before the six-month period was to expire, Mrs. Henderson's conservator filed the renunciation. Approximately a month later, on November 24, the conservator, by motion, formally requested that the trial court ratify the election. And on June 3, 1987, thirteen-and-a-half months after the will was admitted to probate (and a little more than six months after the conservator filed her request for ratification), the court so ordered.

By appellant's calculus, the conservator failed to make a timely election because, while the renunciation was filed within the statutory time limit, the trial court did not authorize that renunciation until several months later. We find appellant's position untenable. We read the statute as a directive to surviving spouses and their guardians to act within the time period; we do not believe its intent is to impose a

deadline on the court, or to punish surviving spouses where the court fails to meet that deadline. To accept appellant's analysis would mean that even the most assiduous guardian could never be assured that she had successfully complied with the statute's requirements, for even were the guardian to request on the very day the will was admitted to probate authorization to elect the statutory share, the court might not respond to this request until the six-month period had expired.

We agree with appellant that it is perhaps a better practice, and more finely in accord with the literal language of the statute, for a conservator to request authorization from the court prior to the election, rather than ratification afterwards, but we believe that in the present case, the purposes of the statute have been satisfied. By filing the renunciation within six months, the conservator put the estate's representative on notice within the statutory period that renunciation was being sought. Such notice goes a long way toward reducing uncertainty in the settlement of an estate, and thus furthers a main goal of the time limitation. *See Mead v. Phillips,* 77 U.S.App.D.C. 365, 373–74, 135 F.2d 819, 827–28 (1943) (noting also that "though analogous in some respects," this statute is not a statute of limitations).[2]

▮ We note finally that the trial court was correct in concluding that Mrs. Henderson's death on April 24, 1987, while the motion for ratification of the election was under advisement, has no effect on the outcome of this case. It is true that, absent exceptional circumstances, death terminates the right of a surviving spouse, whether competent or incompetent, to renounce the will.[3] *Payne v. Newton, supra*

---

2. We also observe that a conservator was not appointed for Mrs. Henderson until three months after the will was admitted to probate. Because Mrs. Henderson was unable to act until the conservator was appointed, there is a plausible argument that the statutory time period should have been tolled until the conservator was qualified. *Cf.* D.C.Code § 12–302 (1989 Repl.) (providing that where person is *non compos mentis,* running of statute of limitations is tolled until removal of disability). However, we

need not reach this issue, as the conservator in any case filed the renunciation within six months of the admission of the will.

3. For an example of such exceptional circumstances, *see Mead, supra,* in which it was held that a court could act to renounce the will on an incompetent spouse's behalf, even after the death of that spouse, where the trustee for the incompetent spouse was herself a beneficiary under the will as well as the representative of the decedent's estate, and thus had interests

note 3 (incompetent spouse); *Cahill v. Eberly,* 59 App.D.C. 228, 38 F.2d 539 (1930) (competent spouse). In the present case, however, Mrs. Henderson, acting through her conservator, filed her election to renounce the will while she was still alive. That Mrs. Henderson did not live to receive her share does not alter our analysis.

### III.

Having determined that the conservator made a timely election to renounce the will, we next examine the question of what standard the court is to use in deciding whether to ratify this election.

### A.

In this jurisdiction, an individual who is predeceased by his or her spouse, and whose spouse leaves a will, either may take the property left him or her in the will or, alternatively, may choose to take the share provided for by statute, an amount equal to that which the individual would have received had the spouse died intestate, up to a maximum of one-half the net estate.[4] D.C.Code § 19–113 (1989 Repl.). Where a surviving spouse takes no action within the statutorily prescribed six-month period, he or she is held to have elected to take under the will. *Id.*

▇ The concept of a statutory share derives from the common-law right of dower, in which a wife, if she survived her husband, received a life estate in one-third of all land held by the husband during their marriage. Kurtz, *The Augmented Estate Concept Under the Uniform Probate Code: In Search of an Equitable Elective Share,* 62 IOWA L.REV. 981, 982–90 (1977); *The Incompetent Spouse's Election: A Pecuniary Approach,* 18 U. MICH.J.L. RE-

FORM 1061, 1061–63 (1985) (hereinafter, *The Incompetent Spouse's Election* ). It was originally intended to protect the wife from disinheritance and to prevent her from becoming a public charge; more recently, it has also come to be seen as a recognition of the surviving spouse's contribution to the accumulation of the deceased spouse's wealth. Kurtz, *supra,* at 982, 985, 1055; *The Incompetent Spouse's Election, supra,* at 1061–62. Once properly elected, the competent spouse's right to the statutory share is absolute: the surviving spouse can take the share for any reason, or for no reason, and need not get approval for the action.

The case of the incompetent surviving spouse, however, is, to some extent, necessarily different. The incompetent spouse, by definition, cannot make the election for himself or herself. Our statute therefore provides that a fiduciary may act for the spouse and that the fiduciary must get the authorization of the court to renounce the will. D.C.Code § 19–113(c).[5] This brings us back to our initial inquiry: what standard the court is to use in determining whether it should authorize an election, on behalf of the incompetent spouse, to take the statutory share?

Courts in this country have, by and large, taken one of two general approaches in answering this question. Both approaches, not surprisingly, purport to address the best interests of the surviving spouse.

The first approach, and the one adopted by the trial court, is usually characterized as the minority view. It has as its central precept the belief that in most circumstances, the best interests of the incompetent spouse will be met by electing the option

directly in conflict with those of the incompetent spouse. *See also Payne v. Newton,* 116 U.S.App.D.C. 319, 322, 323 F.2d 621, 624 (1963) (limiting *Mead* to "its special facts").

4. Under the laws of intestacy of this jurisdiction, a surviving spouse receives one-third of the estate where the decedent is survived by children or descendant of a child; one-half of the estate where the decedent leaves no children or descendant but leaves other surviving relatives; and the whole estate where there are no surviving relatives. D.C.Code §§ 19–301 to –304 (1989 Repl.).

5. Consistent with this scheme, a recently enacted statute setting forth the powers vested in the court (which may be exercised directly or through a conservator) "with respect to the estate and business affairs of a protected individual" includes the power to exercise the right to the statutory share. D.C.Code § 21–2055 (1989 Repl.).

which provides the surviving spouse with the greatest monetary value. *See, e.g., In re Estate of Clarkson,* 193 Neb. 201, 226 N.W.2d 334 (Neb.1975); *Wentworth v. Waldron,* 86 N.H. 559, 172 A. 247 (1934).

The second, or majority, approach, on the other hand, comprises the view that the minority approach involves too narrow a conception of the spouse's best interests. While courts favoring the majority approach look upon the pecuniary value of the property as one factor in their analyses, they assert that other considerations should be taken into account as well. Most frequently, they argue that an incompetent spouse has no need for, and cannot benefit from, a great increase in assets, *see First National Bank of St. Petersburg v. Mac-Donald,* 100 Fla. 675, 130 So. 596, 598–99 (Fla.1930); *Kinnett v. Hood,* 25 Ill.2d 600, 185 N.E.2d 888, 890 (Ill.1962); that, therefore, the only ones who will benefit from a renunciation of the will are the surviving spouse's heirs (whose benefit, most majority courts agree, it is not proper to consider), *see Edwards v. Edwards,* 106 So.2d 558, 564 (Fla.1958); and that a loyal spouse, if competent, would most likely respect the predeceasing spouse's wishes, *see Turner v. First National Bank & Trust Co. of Muskogee,* 262 P.2d 897, 903 (Okla. 1953). Furthermore, there is a nearly uniform concern with preserving the testator's intent, and the sentiment is often expressed that "when the husband has made ample provisions for his [incompetent] wife, he has an inherent right to dispose of his property as he pleases." *MacDonald, supra,* 130 So. at 599; *accord Edwards, supra,* 106 So.2d at 564; *Kinnett, supra,* 185 N.E.2d at 889.[6]

B.

■ Having considered both approaches to this matter, we believe the minority view to be the better one as well as the one most consistent with the rationale of what little precedent exists in this jurisdiction. *See Mead, supra.*[7] The forced share statute was developed as a means of protecting surviving spouses. Thus, courts facing a request by the representative of an incompetent spouse for authorization to renounce the will must base their decision on what will most benefit the surviving spouse. We agree with one observer who has noted that while "[b]enefit is not identical with money . . . there is, alas, a firm correlation." Friedman, *supra* note 6, at 409.

We cannot agree with the reasoning of those courts which would deny an incompetent surviving spouse his or her elective share because the amount the spouse would thereby receive is beyond what the spouse "needs" or is likely to spend. *See, e.g., Kinnett, supra,* 185 N.E.2d at 890 ("[A]nything beyond her maximum needs would be worthless. She could not use it, give it away or dispose of it by will."). The standard to be applied is what is in the incompetent's best interests, not merely what is adequate; it is hard to imagine, in any event, how giving the spouse *less* money would very often be in the spouse's interest. Moreover, one commentator has noted that the availability of a larger pool of funds may often allow the incompetent spouse to enjoy an increased level of care, and is likely, regardless, to provide her with added security. *The Incompetent Spouse's Election, supra,* at 1072–74. In addition, the court in *Mead* noted that a surviving spouse may derive satisfaction from knowing that her heirs will be well

---

6. For a general discussion of both the majority and minority approaches, see Friedman, *The Renounceable Will: The Problem of the Incompetent Spouse,* 1958 Wis.L.Rev 400; *The Incompetent Spouse's Election, supra.*

7. Although we have never explicitly decided the precise question before us today, *Mead, supra,* speaks to several of the underlying issues. In *Mead,* after finding that the circumstances warranted an election on behalf of the incompetent spouse even after her death, see *supra* note 3, the court went on to address the second argu-

ment presented: that because the deceased husband's will made "ample and liberal provisions" for the incompetent widow and because the provisions of the will were "indubitably designed for her personal interests, welfare, and advantage," a court would have necessarily decided that the widow should take under the will. 77 U.S.App.D.C. at 368, 135 F.2d at 822. In rejecting this argument, the *Mead* court rejected much of the reasoning underlying the majority approach. *See id.* at 374–77, 135 F.2d at 828–31.

provided for. 77 U.S.App.D.C. at 375, 135 F.2d at 829 ("[E]ven in the case of a woman of unbalanced mind, who can say how much of comfort and happiness may come from believing that her children or other dependents will be protected and cared for, during her lifetime and after her death"). Finally, we observe that our statute makes no distinction between competent and incompetent surviving spouses in designating the amount they can take as an elective share.[8] We agree with the observation in *Wentworth, supra,* 172 A. at 250, that there is no "legal or equitable principle by which [the testator] is empowered to satisfy [his incompetent wife's] claims upon his estate by making suitable provision for her support in his will," and with its further conclusion that "A widow is not to be penalized because she is insane," *quoted in Mead, supra,* 77 U.S.App.D.C. at 375, 135 F.2d at 829.

Second, we cannot accept the emphasis majority courts place in these circumstances on honoring the testator's wishes. While it is true that great respect is ordinarily to be paid to testamentary intent, the very purpose of a forced share statute is to override the decedent's plan. *See Wentworth, supra,* 172 A. at 250 ("the right of a husband to dispose of his property by will is subject to the paramount legal rights of his widow in the estate"), *quoted in Mead,* 77 U.S.App.D.C. at 375, 135 F.2d at 829; *The Incompetent Spouse's Election, supra,* at 1071–72. Furthermore, as the court observed in *Mead, supra,* 77 U.S. App.D.C. at 375, 135 F.2d at 829, "We see no reason for assuming that the intention of the legislators was to protect the heirs of the husband, anymore than the heirs of

the wife." Nor do we understand how the testator's intent has any relevance to the central determination of the incompetent spouse's best interests. *See Clarkson, supra,* 226 N.W.2d at 337.

■ Finally, we note that generalized statements to the effect that a loyal wife, adequately provided for, would not, if competent, renounce her husband's will, paint more of a rosy picture than an accurate one. One could as easily, and perhaps more plausibly, conclude, as did the court in *Wentworth, supra,* that "[i]f it were permissible to determine what [the incompetent surviving spouse] would do by the course experience shows is pursued by the average of mankind, we would say unhesitatingly that she would take all that she had a lawful right to" (quoting *Trower v. Spady,* 117 Va. 173, 83 S.E. 1049, 1050 (1915)). While what the surviving spouse would have done if competent is certainly relevant to her best interests and to the purposes of the statute, it is ordinarily very difficult to discern this information in any particular case. Thus, only where there is a clear indication of the incompetent spouse's actual wishes, and not simply conjecture as to what one in his or her situation might generally do, should this be taken into account.[9] *Cf.* D.C.Code § 19–113(f) (providing for the operation of a valid antenuptial or postnuptial agreement).

In conclusion, we hold that absent clear evidence that the incompetent spouse's interests or desires are otherwise, courts should presume that the option which is in the spouse's best interest is the one that would provide the spouse with the greater share of the estate.[10]

---

8. In contrast, see C.R.S. § 15–11–203 (1973), *cited in Sweeney v. Summers,* 194 Colo. 149, 571 P.2d 1067, 1068 (1977), which provides that in cases involving a "protected person," the court can only elect to waive the will after finding that it is "necessary to provide adequate support for the protected person during his probable life expectancy."

9. One commentator notes that even where the surviving spouse's intent is discernible, it may not provide a proper basis for decision. Thus, a competent surviving spouse, not subject to court interference, might choose a "ridiculously smaller share," yet were the same spouse incom-

petent, the commentator argues, the court would have an obligation to "determine her best interests objectively, rather than speculate upon what she might have done under other circumstances." *The Incompetent Spouse's Election, supra,* at 1077.

10. Such clear evidence might come from such things as estate tax consequences or escheats. We postulate two cases by way of example.

(1) Wife has left a small legacy to her incompetent husband, with the remainder of the two million dollar estate to the children of wife and husband. Husband has independent assets to-

## IV.

■ Having thus set forth the appropriate standard to be used in reviewing an election to renounce the will, we now examine the trial court's application of that standard.

Upon his death, Mr. Henderson left an estate valued at $378,348.14.[11] His will provided for monetary bequests to certain of his relatives and to his secretary, which totaled $115,000. The remainder of the estate, approximately $200,000, was placed in a trust for the benefit of Mrs. Henderson. Under the terms of the trust, the income and the corpus of the trust were to be distributed to Mrs. Henderson to the extent the trustee[12] deemed "necessary or advisable for [her] welfare, comfort, and support," after first taking into account Mrs. Henderson's own resources.[13] Upon Mrs. Henderson's death, $20,000 from the trust was to pass to certain of Mr. Henderson's relatives, if living; the remainder was left to Southwestern College in Kansas and the DACOR Educational and Welfare Fund.

There is little dispute about the amounts involved: all agree that by taking under the will, Mrs. Henderson would have received approximately $200,000 in trust, and that by electing her statutory share, she would have taken approximately $160,000 outright. Nonetheless, the parties are in basic disagreement as to which option would provide Mrs. Henderson with the greatest pecuniary value.[14]

There is little doubt, we believe, that where the surviving spouse is competent, an amount received outright is to be valued more highly than the same amount received in trust. Where the surviving spouse is incompetent, however, the difference between the two options is substantially reduced. Any amount the incompetent surviving spouse receives "outright" will be administered not by the spouse to do with as he or she pleases, but by the spouse's conservator, subject to the conservator's fiduciary duties.[15]

In trying to resolve this issue, the trial court focused on the fact that Mr. Henderson's will provided that the trustee was only to make any distribution after first taking Mrs. Henderson's other re-

talling twenty million dollars. His will, made prior to his incompetency, after leaving a sizeable legacy to wife if she survives him, leaves the balance of this estate to the children of himself and wife. Compelling the husband's conservator to take the statutory share may impose double federal estate taxation on the assets ultimately reaching the children.

(2) Husband dies leaving his estate in trust for his incompetent wife for her lifetime, with the remainder after her death to legatees who are the natural objects of the bounty of both husband and wife. Wife has no heirs at law and next of kin and made no will while competent. Her life estate is of less monetary value than her statutory share would be. If her conservator is required to elect the statutory share, any balance remaining upon her death would escheat to the state.

**11.** At the time of the trial court's decision, the estate was valued at $311,892.75. Subsequently, an additional $66,455.43, which was registered in a money market account, was held to be properly part of Mr. Henderson's estate.

**12.** Mr. Spencer, the personal representative of Mr. Henderson's estate, was named trustee.

**13.** Mrs. Henderson's own resources consisted of approximately $44,000 in cash held in bank accounts, jewelry valued at approximately $164,-

000, and an income of approximately $3,550 per month in widow's survival benefits from the Foreign Service Retirement System and in Social Security payments. Mrs. Henderson's expenses for her care at the nursing home were estimated to be $2,642.50 monthly.

**14.** Neither side suggests that there is any evidence in the record indicating what Mrs. Henderson's views were, or would have been, in this matter.

**15.** Various courts and commentators have discussed how to value these competing options. Some have simply stated that a fee title is necessarily of greater value than a beneficial interest in a trust. *E.g., Clarkson, supra,* 226 N.W.2d at 338. Others have looked at the likelihood that the corpus of the trust would actually be distributed to the spouse under the terms of the trust. *E.g., In re Callan's Estate,* 101 Ohio App. 114, 135 N.E.2d 464, 469 (1956). Still others have included the full value of the trust corpus in their estimation of funds available to the surviving spouse under each option. *E.g., Edwards, supra,* 106 So.2d at 562; *The Incompetent Spouse's Election, supra,* at 1083 (arguing that full value of the trust is the proper measure of the value of the security derived from the emergency power to invade the corpus).

sources into account, and that Mrs. Henderson had adequate monthly income to cover the expenses of her nursing home care. In addition, the court observed, the trust was to terminate upon her death, and the remainder of the corpus was to be distributed to Mr. Henderson's relatives and two charitable organizations. Thus, the court concluded "as a practical matter, Mrs. Henderson stood to receive nothing under her husband's will," and would necessarily be better off taking her statutory share.[16]

While it is not precisely true to say that Mrs. Henderson would receive nothing under her husband's will—the trust would have provided her, at a minimum, with a certain amount of security that her needs would not go unmet—we think it reasonable, and consistent with the overall minority approach, to say that this is not worth as much as having the money actually trans-ferred to one's account, even if only to be administered by a conservator. We note that to conclude otherwise would make it possible for a testator to sidestep the provisions of the elective share statute simply by making adequate provision for an incompetent spouse—and then providing that the excess go to the testator's own heirs.

In any event, we hold here that the trial court, in ratifying the conservator's election for Mrs. Henderson of the statutory share, acted reasonably and did not abuse its discretion.

*Affirmed.*

---

16. In noting that the remainder of the trust was to go to Mr. Henderson's heirs, the trial court points out what in reality is perhaps the most meaningful distinction between the two options presented here: whose heirs will ultimately get the money. If Mrs. Henderson takes under the will, her husband's heirs will receive whatever remains of the $200,000 placed in trust for her; if, on the other hand, she takes the statutory share, her heirs will receive much, if not all, of the $160,000 she stands to take outright. The record provides us with no indication in the present case as to whom Mrs. Henderson would rather have had this money go to, and we have no reason to prefer one set of heirs over the other. *See Mead, supra,* 77 U.S.App.D.C. at 375, 135 F.2d at 829.